UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MAJID KOLESTANI, a/k/a NASTARAN KOLESTANI, | Case No. 3:19-cv-00129-REB |
| Petitioner, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| TEREMA CARLIN, | |
| Respondent. | |

Petitioner Majid Kolestani, also known as Nastaran or "Rose" Kolestani, is proceeding on her Petition for Writ of Habeas Corpus challenging her state court conviction. (Dkt. 1.) Respondent Terema Carlin has filed a Motion for Summary Dismissal, asserting that this action was filed outside the statute of limitations period and that all but one of Petitioner's claims are procedurally defaulted. (Dkt. 12.) Petitioner has filed a Response, and Respondent has filed a Reply. (Dkts. 13, 14.) The Court also ordered the parties to supplement the state court record with certain records relevant to the issues at hand. (Dkt. 16.) The parties have completed their supplemental filings.[1] (Dkts. 17-21.)

---

[1] Petitioner filed correspondence between herself and her attorneys between 2013 and 2019, which may be related to the procedural issues, but not to the merits of her claims. *See* Dkt. 17.

**MEMORANDUM DECISION AND ORDER - 1**

All named parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. (Dkts. 6, 7.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. The Court takes judicial notice of the state court records lodged by the parties. Fed. R. Evid. 201(b); *Dawson v Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Having reviewed the record in this matter and considered the arguments of the parties, the Court enters the following Order.

## SUMMARY DISMISSAL

### 1.  Standard of Law Governing Summary Dismissal

When a petitioner's compliance with threshold procedural requirements is at issue, a respondent may seek summary dismissal rather than file an answer. *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989). In addition, Rule 4 of the Rules Governing § 2254 Cases authorizes summary dismissal of a petition for writ of habeas corpus without an answer or motion from the respondent when "it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court."

The Court has concluded that the statute of limitations issue may require an evidentiary hearing to pinpoint the date Petitioner understood English well enough to be able to ask another inmate to help her contest her conviction, or to ask the paralegal what legal resources were available to contest a conviction, or to go to the legal resource center and identify and pick up a habeas corpus packet. It is apparent she understands English well enough to ask her case manager to complete a complex asylum application for her signature in 2012. (Dkt. 13, p. 2.) Moreover, Petitioner's own allegations in her post-

conviction petition reflect that she was able to ask people around her for legal help and

opinions as early as June 1, 2009, during plea negotiations with the State:

> Petitioner ... asked if she could take the Plea Agreement with
> her back to her cell, so she could try to get input from other
> inmates who had a lot more experience with the IDAHO
> criminal justice system, about the agreement. Counsel told
> her that she could not talk to anyone about the Plea
> Agreement, and that she could not allow Petitioner to take the
> Plea Agreement with her back to the jail for advise [sic].

(State's Lodging B-1, p. 30.) These two pieces of evidence contrast with her assertion

that it was not until 2014 that she was able to understand English well enough to, and did,

find another prisoner to assist her in contesting her conviction and sentence.

On post-conviction review, the state district court found a genuine issue about

Petitioner's language abilities during the time period she sought tolling. However, the

state court also found that her claims were meritless; therefore, that court ignored the

timeliness issue and addressed and denied the merits of her claims. Petitioner presented a

narrowed-down set of claims to the Idaho Court of Appeals, which also addressed and

denied the merits of her claims.

Respondent also asserts that except for Claim 1, all of Petitioner's claims are

procedurally defaulted because not all the claims that were included in the post-

conviction petition were included in the appellate briefing. For claims defaulted at the

post-conviction appellate stage of proceedings, the *Martinez v. Ryan* exception would not

apply to excuse the default of IATC claims, but *Coleman v. Thompson* cause and

prejudice may be available to excuse the other claims. These equitable issues would

require additional evidentiary development.

**MEMORANDUM DECISION AND ORDER - 3**

Federal courts are not required to address a procedural issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518 (1997); *cf. Franklin v. Johnson*, 290 F.3d 1223 (9th Cir. 2002) ("appeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar"). Thus, where a procedural question presents a complicated question of law and is unnecessary to a disposition of the case, a court may proceed to the merits. *Hudson v. Jones*, 351 F.3d 212 (6th Cir. 2003); *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir.1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted); *cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Therefore, as the Court will explain, it has reviewed and preliminarily denied Petitioner's claims on the merits rather than further address the procedural issues. The Court will provide Petitioner a final opportunity to respond to this notice of intent to deny the claims before the Court dismisses the claims and enters judgment.

## REVIEW OF PETITION FOR WRIT OF HABEAS CORPUS

### 1. Background

Petitioner and her husband were Iranian refugees, who had recently come to Twin Falls, Idaho, from Turkey, where they had sought refuge from discrimination and potential harm in Iran, their country of origin. At the time she entered the United States,

Petitioner was a transgender individual undergoing a change from male to female. She already had her testicles removed and was undergoing hormone therapy while waiting to have the remainder of her sex change surgery. She suffered great difficulties growing up as a transgender person in Iran. Although doctors had recommended that she be able to complete the surgery to become a woman, she was not permitted to do so. She was not able to dress as a woman in Iran but did so in the United States.

Petitioner and her husband, Ehsan Kababian, had been together about eight years. Petitioner asserts that Kababian had been planning to leave her for a woman in Iran. Petitioner was distraught over Kabibian's plans and tried to convince him not to leave her, because she felt she had no life apart from him. On the evening in question, neighbors in a nearby apartment noticed that Petitioner and Kababian had been arguing for hours. A witness noticed Kababian leave home, park his car on the road, return home, and then get back in his car. While Kababian's car was still stopped, two witnesses saw Petitioner approach his car window, then knock on it with a gun, and when the door was opened saw Petitioner shoot Kababian in the face, killing him. (*See* State's Lodging B-2.)

One of the witnesses, a Daniel Thornquest, provided a written statement and diagrams of the scene to police investigators and testified before the grand jury. (State's Lodgings B-2 and D-3.) As recounted by the prosecutor, he would have testified at trial to the following:

> Mr. Thornquest saw [Petitioner] knock on the window of the car with the gun. The door was then opened by either Miss Kolestani or Mr. Kababian. She pointed the gun at his face and fired the gun. Immediately after the gun was fired, the car accelerated at a high speed across the street into the

> house which is marked here on the map as—there's an arrow
> that shows the path of the car. There is a little box that shows
> the car, and the address there is 425 Fifth Avenue East.
>
> It is important to note that although obviously Mr.
> Kababian was the main victim in this cases, that the people in
> the house were standing in the room, which the car punched
> through the wall of, and, obviously, the uncontrolled car
> driving at high speeds and in the middle of the night in a
> residential neighborhood was a great danger.

(State's Lodging B-2, pp. 20-21.)

A woman named Maggie Johnson, who had been outside her residence nearby,

also witnessed the shooting. She described seeing Petitioner stand at the driver's side

door and fire into the interior. Ms. Johnson saw the muzzle flash from the weapon.

(State's Lodging D-1, p. 61.)

After shooting her husband, Petitioner returned to her apartment and tried to

commit suicide with the same handgun. However, the shot to her head only grazed her

skull. She was taken by ambulance to the Twin Falls hospital, and then by helicopter to a

Boise hospital. While at the Boise hospital Detective Van Vooren attempted to interview

her and advise her of her *Miranda* rights, but Petitioner did not understand. The

investigator then arranged for a Farsi interpreter to interpret the *Miranda* rights into the

Farsi for Petitioner, after which she agreed to speak with the detective. In the interview,

she confessed that she had shot her husband because he had indicated that he was leaving

her for another woman. She said she realized immediately that she had made a big

mistake.

In September 2008, a grand jury issued a superseding indictment, charging Petitioner with the first-degree murder of Mr. Kababian. (*Id*.) She was also charged with a weapon enhancement. Petitioner's attorneys were the Twin Falls County public defenders, Marilyn Paul and Ben Andersen. (*Id*., p. 15.)

Petitioner's attorneys began preparing for trial. They requested discovery and reviewed the discovery materials provided by the State. (State's Lodging D-4.) In September 2008, they moved for a change of venue. In December 2008, they filed a motion to suppress Petitioner's hospital statement to the police investigator or, alternatively, for dismissal. Also in December, they filed a challenge to the grand jury indictment. (*See* State's Lodgings D-6.)

In March 2009, counsel supplemented the grand jury challenge, which then contain 22 separate grounds, and supplemented the motion to suppress/motion to dismiss. In April, counsel moved for appointment of a psychiatrist expert witness for Petitioner, specifically George Brown, a nationally-recognized expert on Gender Identity Disorder. Also, in April, after the first challenge to the grand jury indictment was denied, counsel filed a renewed challenge to the grand jury indictment and filed a motion for appointment of an Iranian cultural expert, Nayereh Fallahi.

The motions for appointment and payment of the experts were granted. (See State's Lodging D-6.) The State objected to use of the experts due to late disclosure; however, the court said it would decide the objections later, and that the State must show prejudice from the late disclosure.

**MEMORANDUM DECISION AND ORDER - 7**

In May, counsel filed a renewed motion for change of venue, with various news stories about Petitioner and the crime attached. Also in May, counsel filed a motion in limine to exclude photographs of the deceased victim at trial, and a motion to allow Petitioner to wear female clothing at trial. (*See* State's Lodgings D-6.) Petitioner's counsel also filed an objection to the court's supplemental trial and pretrial order, and an objection to the court's juror questionnaire advisory instruction.

Throughout this time, the prosecution and the public defenders also engaged in plea negotiations. On January 5, 2009, the State offered to dismiss the weapons enhancement if Petitioner would plead guilty to first degree murder, and the State would recommend a fixed sentence of 20 years. The offer was valid for five days. On January 28, 2009, the State renewed the offer, which was valid until February 20, 2009.

On March 4, 2009, the State made what it designated its "final" offer, consisting of the following alternative terms: if Petitioner pleaded guilty by March 6, the State would re-offer the previous terms; if she pleaded guilty to *both* murder and the enhancement by March 13, the State would recommend 20 fixed years; if she pleaded guilty to both by March 20, the State would stipulate to 20 fixed years and request that the court be bound by the stipulation; if she pleaded guilty to both after March 20, the State would recommend 25 fixed years. (*See* State's Lodging D-7.)

The parties had further discussions on May 27 and 28, which was then less than 30 days from trial. Despite its earlier "final" offer timetable that was designed to become less attractive to Petitioner as trial neared, the State agreed to an offer that was better than any previous offer—plead guilty to first degree murder in exchange for dismissal of the

weapon enhancement and the parties would stipulate to 18 fixed years and request that the judge be bound by that stipulation. In addition, Petitioner would waive her right to file an appeal and a sentence challenge. (State's Lodging D-7, p. 6.) The offer was valid until June 1, 2009. Petitioner signed it on May 31, 2009. (*Id*.) She signed the accompanying guilty plea advisory form on June 1, 2009, the same day as the change-of-plea hearing. (*Id*., pp. 7-15.) Nothing in the plea records shows that any immigration issue was part of the plea-bargaining process. (*See* State's Lodging D-7.)

At the change-of-plea hearing. Petitioner had her own Farsi interpreter, Dr. Dabestani, appearing in person, and the Court had its own certified Farsi interpreter, Dr. Aslanian, appearing by telephone. At times, the two interpreters consulted to ensure that the translations were accurate. Petitioner admitted to killing her husband with premeditation, and the Court later sentenced her in accordance with the plea agreement.

Petitioner asserts that she lived in isolation in prison for about three years and did not learn very much English during that time frame. Five years after conviction, in 2014, another prisoner helped Petitioner draft and file a very late post-conviction action, containing allegations about the plea bargaining and change-of-plea proceedings. The state district court did not decide the statute of limitations issue but instead denied Petitioner's entire post-conviction action on the merits. The Idaho Court of Appeals agreed that the limited claims brought on appeal had no merit, and the Idaho Supreme Court denied Petitioner's petition for review without comment.

## 2.  Habeas Corpus Standard of Law

### A.  AEDPA Deferential Review Standard

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A challenge to a state court judgment that addressed the merits of any federal claims is governed by Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

As to the facts, the United States Supreme Court has clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. 170, 180 (2011); 28 U.S.C. §2254(e)(2). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim (1) was adjudicated on the merits in state court and (2) the underlying factual

MEMORANDUM DECISION AND ORDER - 10

determination of the state court is not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014). In such case, a "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner must show, by clear and convincing evidence, that the factual findings are not just erroneous, but unreasonable, in light of the evidence presented to the state courts. 28 U.S.C. § 2254(e)(1); § 2254(d)(2).

Where a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1) the petitioner must show that the state court—although it identified "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S 415, 426 (2014).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's factfinding or legal conclusions are incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Pizzuto v. Yordy*, 947 F.3d 510, 530 (9th Cir. 2019).

If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

### B.  *De Novo Review Standard*

In some instances AEDPA deferential review under § 2254(d)(1) does not apply: (1) if the state appellate court did not decide a properly-asserted federal claim, (2) if the state court's factual findings are unreasonable under § 2254(d)(2), or (3) if an adequate excuse for the procedural default of a claim exists. In such instances, the federal district

**MEMORANDUM DECISION AND ORDER - 12**

court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). As in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

### C.  Harmless Error Standard

Even if a petitioner succeeds in demonstrating a constitutional error in his conviction under any of the above standards, he or she is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). However, some types of claims "are analyzed under their own harmless error [or prejudice] standards, which can render *Brecht* analysis

**MEMORANDUM DECISION AND ORDER - 13**

unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). Ineffective

assistance of counsel claims are included in this category. *Musladin v. Lamarque*, 555

F.3d 830, 834 (9th Cir. 2009).

### 3.  Claim 1

In her federal Petition for Writ of Habeas Corpus, Petitioner articulates Claim 1 as

follows:

> Petitioner was forced and/or allowed to enter into a plea
> agreement without having the ability to do so knowingly,
> intelligently and voluntarily. Petitioner is an Iranian refugee
> who, at the time of the agreement, spoke, read and
> comprehended very little of the English language. Petitioner
> asserts that her defense counsel directed her to sign the Plea
> Agreement despite knowing Petitioner did not fully
> understand its contents; and that she was told she would be
> immediately deported to Pakistan or Afghanistan if she did
> not sign it, causing her dire fear of being executed there due
> to her "Transgender Disorder." This Plea Agreement is
> unconstitutional and invalid.

(Dkt. 3, p. 6.)

### *A.  State District Court Findings and Conclusions*

On post-conviction review, the state district court found that these same claims

were "disproven by the record" and granted the State's motion to dismiss Petitioner's

claims that (1) she did not enter in to her plea agreement "knowingly, voluntarily and

intelligently because she was ignorant of immigration consequences," and (2) that "her

counsel, Marilyn Paul, told Kolestani that she would be immediately deported if she did

not plead guilty." (State's Lodging B-2, p. 58.)

**MEMORANDUM DECISION AND ORDER - 14**

Recognizing that on post-conviction review, the state district court functions as the "trier of fact regarding issues ultimately presented at trial," the court noted that it was entitled to resolve conflicting inferences from facts in the record that are not in dispute. *Adams v. Idaho*, 348 P.3d 145, 150-51 (Idaho 2015). (*Id.*, p. 58.) Therefore, as specifically noted by the district court, factual assertions disproved by the record cannot create an issue of fact requiring trial. (*Id.*, p. 59.)

Before this federal court, the findings of fact of the state appellate court (and the state district court findings of fact *not in conflict with state appellate court findings of fact*) are entitled to AEDPA deference. *See James v. Ryan,* 733 F.3d 911, 916 (9th Cir. 2013) (noting that *Johnson* "does not require us to ignore a state court's explicit explanation of its own decision"); *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)(we look "to the last reasoned decision" resolving a claim).

Accordingly, under §2254(e)(1), this Court presumes state court findings of fact are correct, unless Petitioner shows, by clear and convincing evidence, that the findings of fact are incorrect *and* unreasonable. In *Pizzuto v. Yordy*, the Ninth Circuit reiterated the high standard for such a showing:

> Under § 2254(d)(2), we may not characterize a state court's factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Brumfield*, 135 S. Ct. at 2277 (alteration in original) (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010)). "Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference." *Id*. "If '[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ...

determination.'" *Id*. (alterations in original) (quoting *Wood*, 558 U.S. at 301, 130 S.Ct. 841).

947 F.3d at 530.

On review of the record from the Petitioner's criminal proceedings, the state

district court found:

- Petitioner indicated in the plea agreement that her decision to plead guilty was freely and voluntarily made and was "not the result of force, threats, promises, or representations other than the representations contained in" the plea agreement. (State's Lodging B-2, pp. 3, 59.)

- Petitioner certified in the guilty plea advisory that she "answered the questions on pages 1-8 of th[e] Guilty Plea Advisory form truthfully, understandin[ing] all of the questions and answers ... hav[ing] discussed each question and answer with [her] attorney, and hav[ing] completed th[e] form freely and voluntarily." (*Id*., p. 4, 59.)

- Petitioner agreed in the guilty plea advisory, "[N]o one has threatened me to [plead guilty]." (*Id*., p. 11, 59.)

- Judge Stoker confirmed Petitioner's written answers during his colloquy with her while taking her guilty plea:

| | |
|---|---|
| The Court: | Miss Kolestani, has anyone pressured you or threatened you or coerced you in any way to enter this guilty plea today? |
| The Defendant: No. | |
| The Court: | Is this plea of your own free will and volition? |
| The Defendant: No, I decided on my own."[2] | |

(*Id*., pp. 59-60, citing Tr. 18:2-15.)

---

[2] The state district court specifically asked Petitioner: "Miss Kolestani, has anyone pressured you or threatened you or coerced you in any way to enter this guilty plea today? She answered, "no." The court then asked her, "Is this plea of your own free will and volition? Dr. Aslanian, the interpreter said, "I am trying to remember the exact word, Your Honor." The Court then said the interpreter could drop out the word "volition" and use only "free will." The interpreter again said, "Your Honor, that is the word I am going blank. I'll ask Mr. Dabestani." The court interpreter consulted with Petitioner's interpreter to obtain a correct interpretation. After that, Petitioner responded, "No, I decided on my own." (State's Lodging B-2, p. 19.)

- Judge Stoker asked Petitioner if all of the answers on the form were her, own, answers; she replied they were. (*Id.*, p. 60, citing Tr. 14:2-15:2)

- Petitioner told Judge Stoker that the answers in the guilty plea advisory were the same answers she would give in court, under oath, if asked those questions. (*Id.*, citing Tr. 13:16-19.)

- Judge Stoker went through the plea agreement in detail on the record, with Petitioner indicating that, in the court's recitation of the plea agreement, "everything was correct." (*Id.*, citing Tr. 9:11-14.)

- Judge Stoker specifically asked Kolestani whether there was any part of her plea agreement in this case that they had not discussed in court today, and Petitioner replied, "No." (*Id.*, citing Tr. 10:14-17.)

- Dr. Saiid Dabestani was seated behind Petitioner during the change-of-plea hearing. Dr. Dabestani speaks Farsi and acted as the defendant's interpreter throughout the case, but not as the official court interpreter [who was Dr. Aslanian, appearing by telephone]. (*Id.*, pp. 60 & n.14.)

Based upon these undisputed facts in the record, the state district court rejected the contrary inferences suggested by Petitioner in her post-conviction petition. "To claim now, some eight years later, that she was acting under the provocation or coercion based on bad advice regarding her immigration status is simply not an inference that this court is willing to make," observed the state district court. (State's Lodging B-1, p. 63.)

The state district court reasoned and concluded:

> Kolestani gave the trial court multiple assurances that her plea was entered knowingly, voluntarily and intelligently, with the advice of counsel. She now changes her testimony before this court, claiming she was ignorant of the process and that Marilyn Paul told her to plead guilty or she would be deported. The record simply disproves these claims. While Kolestani was in the throes of the hearing, having had matters discussed with a local interpreter and her counsel ..., she affirmed multiple times that she entered the plea without any

coercion or threat, and that she did so "voluntarily." As such,
the court concludes that the record disproves Kolestani's
claims; she in fact entered her plea knowingly, voluntarily
and intelligently. There was no violation of her Due Process
rights by Judge[] Stoker's accepting her guilty plea in the
criminal case.

(State's Lodging B-2, pp. 60-61.)

## B. State Appellate Court Findings and Conclusions

In her appeal from dismissal of the post-conviction petition, Petitioner argued that

the petition should not have been dismissed without an evidentiary hearing. The Idaho

Court of Appeals recognized the correct federal constitutional standard of law, which is

that "[w]hether a plea is voluntary and understood entails inquiry into three areas: (1)

whether the defendant's plea was voluntary in the sense that she understood the nature of

the charges and was not coerced; (2) whether the defendant knowingly and intelligently

waived her rights to a jury trial, to confront her accusers, and to refrain from

incriminating herself; and (3) whether the defendant understood the consequences of

pleading guilty." (State's Lodging C-4, p. 5.)

Based on the record, the Court of Appeals made the following findings of fact:

- Throughout the proceedings, Kolestani was provided with
  a Farsi interpreter and advised by counsel. (State's
  Lodging C-4, p. 5.)

- During the change of plea hearing, the district court asked
  her: "Miss Kolestani, have you been able to understand
  the translation from English to Farsi as you worked with
  [the interpreter]?" Under oath, Kolestani answered "Yes."
  (*Id.*)

- The plea agreement was also explained to Kolestani and
  she initialed that she understood that if she was not a
  citizen of the United States, the entry of a plea or making

**MEMORANDUM DECISION AND ORDER - 18**

of factual admissions could result in her deportation or removal from this country.[3] (*Id.*, p. 5; B-1, pp. 7-8.)

- Additionally, during the plea colloquy the district court reaffirmed that Kolestani understood the potential for deportation when it asked, "You have told me, told the Court in this form that you recognize the potential of deportation from this country. Are you aware of that?" Kolestani answered, "Yes." (*Id.*, p. 5.)

Therefore, the Idaho Court of Appeals, concluded, "Kolestani's assertion that her plea was coerced through ignorance is disproved by the record." (*Id.*, p. 5.)

The Idaho Court of Appeals next addressed Petitioner's claim that her counsel was ineffective for coercing her to plead guilty by telling her that "if [s]he did not sign the plea agreement [s]he would be immediately deported due to the nature of the crime." (State's Lodging C-4, p. 5.) The appellate court made the following findings of fact:

- Kolestani signed the plea agreement which specifically indicated that her "decision to accept th[e] agreement and to tender a plea of guilty [was] freely and voluntarily made and [was] not the result of force, threats, assurances, promises, or representations other than the representation contained" in the agreement. (*Id.*, pp. 5-6.)

- When asked on the guilty plea form why she was pleading guilty to the charges in the case, she wrote, "because I did it ... I shot Ehsan on purpose." (*Id.*, p. 6.)

- In the guilty plea advisory, Kolestani certified that she "answered the questions on pages 1-8 of th[e] Guilty Plea Advisory form truthfully, understand[ing] all of the questions and answers ... hav[ing] discussed each question

---

[3] The guilty plea advisory states: "Are you aware that if you are not a citizen of the United States, the entry of a plea or making of factual admissions could: (1) result in your deportation or removal from the United States; (2) preclude you from obtaining legal status in the United States; or (3) prevent you from obtaining United States Citizenship? (State's Lodging B-2, pp. 7-8.) The guilty plea advisory made Petitioner aware that she could be deported upon the guilty plea, or upon making factual admissions. The form does not say that she could not be deported until after she served her sentence. This fact is in contrast to her allegation that her attorneys threatened that she would be deported immediately if she did not sign it; in fact, the form informs her that, if she *did* sign it, it she could be subject to deportation after pleading guilty or admitting that she committed the murder.

and answer with [her] attorney, and hav[ing] completed th[e] form freely and voluntarily." (*Id.*, p. 6.)

- Kolestani agreed that "no one has threatened me to do so." (*Id.*, p. 6.)

- During the plea colloquy, the district court went through the plea agreement in detail on the record and Kolestani indicated that "everything [wa]s correct." (*Id.*, p. 6.)

- When asked: "Miss Kolestani, has anyone pressured you or threatened you or coerced you in any way to enter this guilty plea today?" She replied, "No." (*Id.*, p. 6.)

Upon these facts, the Court of Appeals reasoned and concluded:

> Kolestani argues that her plea was based on counsel's assurances, promises, and representations that without the plea, she would be immediately deported and by force and threat that she did not have time to think about it and without an immediate agreement, the offer would be withdrawn. As such, Kolestani asserts that she had to take the deal and live or reject the deal and die. After considering Kolestani's argument as true (thus eliminating factual disputes), the district court drew the reasonable inference that if such had been the case, Kolestani would not have consistently denied such threats and representations during the extended plea process. Thus, the record belies the claim. Kolestani assured the court multiple times that her plea was voluntary, and no one had threatened or coerced her in any way.

(State's Lodging C-4, p. 6.)

## C.  Federal Court Review of Claim 1

Claim 1 was decided on the merits in state court. Therefore, Petitioner must show that the decision is contrary to, or an unreasonable application of, governing United States Supreme Court precedent under § 2254(d)(2). A plea is "knowing" if a defendant understands the federal constitutional rights she is waiving by pleading guilty, and it is

"voluntary" if she "possesses an understanding of the law in relation to the facts." *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 466 (1938)). Another definition of "voluntary and intelligent" is if the plea "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

The clearly established law governing a Sixth Amendment claim of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on an ineffective assistance claim, Strickland requires that the petitioner show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In measuring the trial attorney's work under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

In assessing prejudice under *Strickland*'s second prong, a court must find that, under the particular circumstances of the case, there is a reasonable probability that, but for errors made by counsel, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is defined as one sufficient to undermine confidence in the outcome. *Id*. at 694.

**MEMORANDUM DECISION AND ORDER - 21**

The petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.* The *Strickland* standard, giving deference to counsel's decisionmaking, is the de novo standard of review. Then, because habeas corpus is collateral review, another layer of deference to the state court decision is afforded under AEDPA.

In reviewing the findings of fact in the state court proceedings, this Court has noted that the state district court found that the guilty plea form was signed "eight days before the change-of-plea hearing." (State's Lodging B-2, p. 64.) But, in fact, the plea agreement is dated May 31, 2009; the guilty plea advisory is dated June 1, 2009, which is the same day as the change-of-plea hearing. (*See* State's Lodging B-2, p. 248, *et seq.*) However, the state appellate court did not rely on the incorrect finding as to the date on which the guilty plea form was signed. Therefore, that erroneous district court finding is of no consequence here. *See James v. Ryan,* 733 F.3d at 916.

Petitioner has not shown by clear and convincing evidence that the other factual findings of the state courts are unreasonable. Rather, her testimony as contained in the record clearly disproves her new allegations raised for the first time six years after her conviction. The Court agrees that the facts at issue are of the nature that did not require an evidentiary hearing because the analysis was a comparison of Petitioner's sworn testimony in the record versus her own new contradictory allegations.

**MEMORANDUM DECISION AND ORDER - 22**

Therefore, with the exception explained above, the Court presumes the state court findings are correct under 28 U.S.C. § 2254(e)(1). That does not end the inquiry, however. AEDPA's deferential "standard is demanding but not insatiable; deference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citation omitted, punctuation altered).

This Court concludes that the record reflects that Petitioner had multiple opportunities to disclose that she did not understand the legal documents or processes; that the interpreters were incompetent or unhelpful; that her attorney threatened her with deportation—which to her was the equivalent of a death sentence—and coerced her to sign the plea agreement; and that she was not permitted to speak about the terms of the offer to her family, friends, or other inmates before deciding whether to accept it. In addition to the correct state court findings referenced above, the record further reflects:

- Petitioner stated under oath that the guilty plea advisory was interpreted for her by Dr. Dabestani, that she understood the translation from English to Farsi by Dr. Dabestani, and that Petitioner signed it. (State's Lodging B-2, pp. 10-11.)

- In the guilty plea advisory itself, Plaintiff checked "no," to the question, "If you were provided with an interpreter to help you fill out this form, have you had any trouble understanding your interpreter?" (*Id.*, p. 10.)

- Petitioner checked "yes" on the guilty plea advisory that she was satisfied with her attorney's representation.

- Petitioner checked "no" on the guilty plea advisory as to whether she was having any difficulty in understanding what she was doing by filling out the form. (*Id.*, p. 5.) She checked "no" for "Is there anything about this plea agreement that you don't understand? (*Id.*, p. 6.) She checked "no" for the question, "Have you had any trouble

answering any of the questions which you could not resolve by discussing the issue(s) with your attorney?" (*Id.*, p. 10.)

- Petitioner checked "no," to the question, "Do you need any additional time before you enter your guilty plea?" (*Id.*, p. 10.)

- Petitioner checked "no," to the question, "Is there any other matter not covered by your answer to the foregoing questions that affects your decision to plead guilty that you want to tell the Court about, and if so, what?" (*Id.*, p. 11.)

- The guilty plea advisory specifically asked her "why" she was pleading guilty. She did not mention that she was pleading guilty to avoid immediate deportation to a hostile country, which, in her view, would mean immediate death. (*Id.*, p. 10.)

- The indictment was filed September 3, 2008, plea negotiations that were always on very similar terms began in January 2009, and she pleaded guilty on May 31, 2009. Therefore, she had about five months to consider pleading guilty.

- At the change-of-plea hearing, the judge informed Petitioner that the jury trial was set to begin on June 25, 2009, not even a month away, and that by pleading guilty, she was waiving the right to a jury trial. (*See* State's Lodging B-2, pp. 11-12.) Here, again, was another opportunity to tell the Court that she would rather proceed to the upcoming jury trial, but she had decided to plead guilty to avoid a certain and imminent death because of the threat of immediate deportation to a county other than her country of origin or the country where she obtained refugee status.

This Court agrees that Petitioner made representation after representation verbally and in writing that she understood the proceedings, knew what the plea agreement contained, was satisfied with Ms. Paul's performance, had no other questions for the

**MEMORANDUM DECISION AND ORDER - 24**

court, and voluntarily desired to plead guilty for the right reason—that she killed her husband in a premediated manner.

Petitioner now contends that Ms. Paul told her that her sentence was for a period of no more than (18) eighteen years fixed, with no indeterminate period. (State's Lodging B-1, p. 24.) The record shows that any such representation was corrected by the Court's explicit statement that the sentence is 18 years fixed *with life indeterminate*:

> The Court:    [T]he Court will agree to follow the State's sentencing recommendation, which I'm about to state, upon your plea of guilty to the charge of first degree murder, a sentence of life in the Idaho State Penitentiary, with that sentence consisting of a minimum term of confinement of 18 years, followed by an indeterminate period of time not to exceed your natural life.
>
> Let me restate that sentence slightly differently. It means that you will serve at least 18 years in the Idaho State Penitentiary, and after that, it will be up to the Idaho State Parole Board to determine whether you should be released from the penitentiary.
>
> You would receive credit against the 18-year portion of the sentence for time that you have been serving in the Twin Falls County Jail.
>
> Do you understand this portion of the plea agreement as I have stated it thus far?
>
> Defendant:    Yes, I understood one part of it, but the other part I have to talk to my attorney.
>
> The Court:    Okay. Go ahead and do that.
>
> Defendant:    I thank you.
>
> (Discussion off the record between the defendant and her counsel.)
>
> Ms. Paul:    Thank you, Your Honor.
>
> The Court:    Do you remember my question, ma'am?

**MEMORANDUM DECISION AND ORDER - 25**

| Defendant: | Yes. |
| The Court: | Have I correctly stated the plea agreement as far as you're concerned so far? There is more to it. |
| Defendant: | No, everything is correct. |

(State's Lodging B-2, pp. 8-9.)

| The Court: | I will not impose any greater sentence than recommended, nor will I impose any lesser sentence than recommended. Do you understand that? |
| Defendant: | Yes. |

(*Id.*, pp. 9-10.)

Petitioner also asserts she had only the equivalent of a second grader's comprehension level in English. (State's Lodging B-2, p. 25.) However, she attended one year of college in Iran, majoring in psychology, and had one or two English-to-Farsi translators to interpret for her during the state court criminal proceedings. Therefore, her English reading level would be at issue only if she had no translator, but her education is college-level, which is the level upon which she could converse with her interpreters.

Petitioner argues that the judge's extended statements about deportation at the change of plea hearing *confirmed* what she already believed—that Petitioner's deportation would be delayed until after she served 18 years *only* if she pleaded guilty. Indeed, with the Judge's statement that it was possible that she would be deported after she served the fixed portion of the sentence," Petitioner argues that she thought deportation went from "an absolute [if she chose to go to trial]" to a "possibility [if she pleaded guilty]." (State's Lodging B-1, p. 44.) However, Petitioner's claim is much more than that she simply "mixed up" the *timing* of deportation; rather, she contends that her

**MEMORANDUM DECISION AND ORDER - 26**

lawyers *threatened* that she would be deported immediately if she exercised her right to proceed to trial. It is implausible that she waited six years to make this serious allegation simply because she did not speak English well—especially given that she had free and ample access to Farsi translators from the time of her hospital confession on the day of the crime through her post-conviction matter.

At the change-of-plea hearing, Petitioner was provided with every opportunity, including the aid of two interpreters, to state that her attorneys told her that if she did not sign the plea agreement immediately—without being able to consult her family or anyone else—that she would absolutely be deported and sentenced to death in a country she did not come from. And, yet, she did not reveal any pressure, threats, or coercion to the court when directly asked that question in several different ways.

This Court concludes that Petitioner has failed to show that the Idaho Court of Appeals' rejection of this claim—raised either as a stand-alone constitutional claim or enveloped in an ineffective assistance of trial counsel claim—is contrary to, or an unreasonable application of, United States Supreme Court precedent governing guilty plea and assistance of counsel claims. Even if the Court disagreed with the state courts— and it doesn't—Petitioner must overcome the deferential standard of AEDPA and show that no reasonable jurist would disagree with her position. This she cannot do because the state court record is clear and plain on her previous testimony given under oath. Accordingly, this claim appears subject to denial on the merits under 28 U.S.C. § 2254 and dismissal with prejudice.

**MEMORANDUM DECISION AND ORDER - 27**

**4. Claim 2**

Petitioner raised Claim 2 on post-conviction review before the state district court, couched in terms of an ineffective assistance of counsel claim:

> Petitioner asserts that she was unable to waive her Fifth Amendment rights prior to being interrogated by police while under the influence of high dosages of pain medication during recovery of a self-inflicted gunshot wound to her head. Petitioner asserts that the combination of the drugs and her severe language barrier made it impossible to comprehend what was happening. Petitioner also asserts that, being from Iran, she was unaware of the possibility of requesting a lawyer during questioning, in fear that she would "disappear" like people do in her home country when they refuse to speak to police. All information collected and used against her during the interrogation was involuntary and unintelligent of her rights, thus unconstitutional.

(Dkt. 3, p. 7.)

In the post-conviction review, Petitioner asked for appointment of a medical expert to study her medical records from the hospital to show her condition at the time of the questioning. The court granted the request and allowed additional time for briefing and submission of evidence. Petitioner obtained the medical report and later filed a notice withdrawing this particular claim. (State's Lodging B-2, p. 83.) Therefore, the state district court did not rule on the claim, nor did the Idaho appellate courts.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court of the United States held that before a suspect can be subjected to custodial interrogation, law enforcement officers must inform the suspect of his or her constitutional rights. That familiar warning is described as follows:

> [T]hat he has the right to remain silent, that anything
> he says can be used against him in a court of law, that he has
> the right to the presence of an attorney, and that if he cannot
> afford an attorney one will be appointed for him prior to any
> questioning if he so desires.

*Id*. at 479. If a suspect knowingly and intelligently waives his right to counsel after

receiving *Miranda* warnings, law enforcement officers may question the suspect. *North*

*Carolina v. Butler*, 441 U.S. 369 (1975). However, if a suspect requests to talk with an

attorney, any interrogation must cease until the suspect consults with a lawyer or re-

initiates communication with law enforcement officers. *Edwards v. Arizona*, 451 U.S.477

(1981).

As applicable to Petitioner's case, after shooting her husband, Petitioner returned

to her apartment and tried to commit suicide. However, the shot to her head only grazed

her skull. She was taken by ambulance to the Twin Falls hospital, and then by helicopter

to a Boise hospital. While at the Boise hospital, a police investigator attempted to

interview her, and advised her of her *Miranda* rights, but Petitioner did not understand.

The investigator then summoned a Farsi interpreter, then again advised her of her

*Miranda* rights which were interpreted into Farsi for her, after which she agreed to speak

with the detective. In that interview, she confessed that she had shot her husband, because

he had indicated that he was leaving her for another woman. She said she realized

immediately that she had made a big mistake.

Petitioner's counsel moved to suppress the statement. The state district court

suppressed Petitioner's statement made during the first part of the investigation as a result

of her not understanding her *Miranda* rights; however, the state court ruled the second

part of the statement after the *Miranda* rights were given a second time and translated into Farsi was admissible.

On de novo review, this Court finds that Petitioner has provided no evidence that her medical condition impaired her ability to understand the questions or articulate the answers when she was interviewed at the hospital by the police investigator. Petitioner was suffering physical pain from the wound caused by the bullet grazing her head and was under a great deal of emotional stress, having just shot and killed her husband, and realizing it was a terrible mistake. However, the content of the transcript shows that she understood the questions through the translator and was able to speak through the translator. (State's Lodging D-2.) She did not complain of any issues with the quality of the interpretation. Importantly, her version of events matched the witnesses' version of events; accordingly, the record in total is clear that she was coherent, logical, and able to report the events with accuracy. Accordingly, this claim appears subject to denial and dismissal with prejudice under the de novo standard of review.

## 5.  Claim 3(a)

Petitioner contends that she was denied the effective assistance of counsel because her defense attorney did not provide her a version of the Plea Agreement in her native language of Farsi and/or did not allow for sufficient time to find help in making sense of the entirety of the Plea Agreement, despite having had an interpreter available to her during that time. This claim was not presented to the Idaho Court of Appeals.

The Ninth Circuit has confirmed that the Supreme Court does not recognize a constitutional right to a court-appointed interpreter. *United States v. Si*, 333 F.3d 1041, 1043 n. 3 (9th Cir. 2003) (direct appeal of federal criminal conviction). Neither has the Supreme Court ruled that there is a constitutional right to have a plea agreement placed into a written translation, in one's native language. The right to an interpreter does not enjoy independent constitutional stature, but it is derived from and exists to the extent necessary to protect a criminal defendant's rights to confront witnesses, participate meaningfully in his or her own defense, and be assisted by counsel. Therefore, a criminal defendant who was denied a translator can present colorable claims under the Sixth or Fourteenth Amendments if, for example, the defendant had been unable to communicate with his counsel or to understand the proceedings. *See, e.g., Chacon v. Wood*, 36 F.3d 1459 (9th Cir.1994), *superseded by AEDPA on other grounds* (petitioner stated colorable Sixth Amendment ineffective assistance of counsel claim where interpreter misled defendant, impairing communication between attorney and defendant). *See also Rakin v. Martel*, No. 2:10-CV-0715 LKK AC, 2013 WL 1281789, at *9 (E.D. Cal. Mar. 27, 2013); *U.S. v. Ki Chong Yoo*, No. 2:10–cr–203, 2014 WL279611, at *4 n. 3 (D.Nev. Jan. 23, 2014) (noting an interpreter's oral recitations of a document's contents are generally sufficient).

Petitioner's claim fails on de novo review, however, because she has not shown impairment of a specific right as a result of not having had the plea agreement translated into written Farsi. She specifically confirmed at the change-of-plea hearing that the guilty plea advisory had been verbally translated by the translator, Dr. Dabestani, for her. It is

not crystal clear whether Dr. Dabestani verbally translated the *plea agreement* itself, which is directly referenced as part of the guilty plea advisory (noting "see above" with Petitioner's initials next to the question about the sentence promised). However, the guilty plea advisory was verbally translated by Dr. Dabestani before Petitioner signed it and the *contents* of the plea agreement were verbally covered, thoroughly, at the change-of-plea hearing with the aid of two Farsi interpreters. Therefore, Petitioner's due process and fair trial rights were adequately protected and, accordingly, this claim appears subject to denial on the merits and dismissal with prejudice under the de novo standard of review.

### 6. Claim 3(b)

Petitioner asserts that her defense attorney failed to investigate, promote and present any defense argument in the criminal case, despite Petitioner's requests and statements about what happened to the victim. Petitioner says that she was forced to plead to the highest charge of homicide by her defense attorney, even though she was adamant that the killing was unintentional and accidental, thus, not supportive of the convicted charge. Petitioner raised this claim on post-conviction review before the state district court. She did not include it in her appellate briefing.

This Court finds from its review of the record that the course of plea negotiations followed a not unusual pattern of the prosecutor presenting a more favorable plea bargain offer earlier on in the case and then less favorable offers as the trial date quickly approached. The State never offered to lower the charge from first degree murder to second degree murder or manslaughter, but despite the pattern of the negotiation up until

the final offer, it contained a proposed stipulated sentence which had the lowest number of fixed years of any of the offers.

Petitioner stated on post-conviction review that she wanted to present a "battered wife syndrome" argument on her behalf, which, apparently, she believes should have been raised with the State so that it would agree to reduce the charge to second degree murder or manslaughter. On post-conviction review, the state district court rejected the claim, noting: "There is no evidence that Kolestani was battered by the victim." (State's Lodging B-2, p. 71.) Here, as well, Petitioner provides insufficient admissible evidence showing that this would have been a viable defense theory.

Petitioner also stated on post-conviction review that she wanted to argue that the firearm accidentally discharged while she was trying to wrestle the car keys out of the ignition. However, two eye witnesses saw Petitioner open the door and shoot, *with no prelude of wrestling*. The state district court concluded: "There are no admissible facts which set forth what facts Kolestani actually claims she has that the firearm discharged accidentally." (State's Lodging B-2, p. 68.) The state district court found that there was no evidence that a struggle occurred. If it was true that the gun accidentally discharged, the post-conviction court reasoned, then Petitioner was admitting that she lied when she told Judge Stoker that she had murdered the victim by shooting him in a premeditated manner. (*Id*., pp. 68-69.) Ultimately, the state district court concluded that Petitioner had nothing more than "bare and conclusory claims" that her counsel "was not interested" in what she had to say about her case when formulating a defense. (*Id*., p. 69.)

**MEMORANDUM DECISION AND ORDER - 33**

In fact, the additional records provided by the parties show that Petitioner's counsel had actively been preparing for trial. Further, the guilty plea advisory provided Petitioner with the opportunity to lay out exactly what her counsel had not done that should have been done by asking: "Is there anything you have requested your attorney do that has not been done?" Petitioner did not reveal that her counsel had ignored her suggestions for a defense theory, but instead checked "yes," and wrote only, "I needed more hormones and was not able to get them." (State's Lodging B-2, p. 9.) It is implausible that Petitioner would wait six years before asserting a claim that "her attorney did nothing in Petitioner's defense" if she had facts to support it. This claim appears subject to denial on the merits on de novo review and dismissal with prejudice.

### 7.  Claim 4

Claim 4 merely restates Claim 1, with the added allegation that, in coercing Petitioner to enter into the plea agreement, Ms. Paul, the chief of the Twin Falls County public defender office, was serving her own interests instead of Petitioner's interests.

> Petitioner asserts that her defense counsel lied to her and coerced her into signing the Plea Agreement, without appropriate time given to reflect and/or ask relevant questions regarding its contents. Petitioner asserts that her defense counsel used intimidating threats of deportation and other options to force her to sign said agreement. Petitioner contends that a defense attorney should always be looking out for the best interests of their client; and this counsel did not do so in advi[c]e nor action. There was a clear conflict of interest between petitioner and counsel.

(Dkt. 3, p. 9.)

While a criminal defendant has the Sixth Amendment right to be represented by conflict-free counsel pursuant to *Wood v. Georgia*, 450 U.S. 261, 271 (1981), nothing in the record suggests either coercion or that counsel was acting under a conflict of interest. Nor does Petitioner suggest how not proceeding to trial served Ms. Paul's own interests.

The Court's review of the record reveals that Ms. Paul filed her requests for expert witnesses beyond the deadline and the State attempted to have them excluded at trial. However, the state trial court told the prosecutor that the State would have to show prejudice to its defense to support its motion to exclude the Defendant's expert witness testimony. Perhaps that would be motivation for Ms. Paul to recommend a plea agreement, but this Court concludes—regardless of the experts—that the evidence of Petitioner's guilt was extremely strong, with a confession from Petitioner and two eyewitnesses who saw the shooting. Ms. Paul had successfully excluded some of Petitioner's confession by motion, but most of it, including several very damaging statements were deemed admissible, weighing in favor of a plea. Ms. Paul had also tried to obtain a change of venue twice, but the Court ruled against Petitioner both times. That ruling also weighed in favor of a plea, rather than against it.

Looking at the entire record, the Court finds that Petitioner almost certainly would have been convicted of first-degree murder at trial and sentenced to as much or more than the sentence agreed to in the plea bargain. In addition, the weapon enhancement would have remained in place, which would have added to the fixed portion of her sentence. In sum, evidence of Ms. Paul's "self-interest" is weak compared to the strength of the reasons to enter into a plea agreement.

**MEMORANDUM DECISION AND ORDER - 35**

Finally, because the state courts made findings that there was no coercion, and this Court has found those findings of fact reasonable when examined against the record, those facts further support a finding that Petitioner's counsel did not perform deficiently, nor was Petitioner prejudiced by pleading guilty rather than proceeding to trial. Therefore, this claim also appears subject to denial on de novo review and dismissal.

## SUMMARY AND CONCLUSION

Having reviewed the entire record, the Court finds it more judicially efficient to address Petitioner's claims on the merits than hold an evidentiary hearing on the two procedural defect issues raised by Respondent's Motion for Summary Dismissal. The Court preliminarily concludes that the claims are without merit and subject to denial and dismissal with prejudice Therefore, the Court will deny the Motion without prejudice to the claims being raised at a later date, if necessary. The Court will provide Petitioner with an opportunity to respond to this notice of intent to dismiss her entire Petition for Writ of Habeas Corpus on the merits. Thereafter, Respondent may, but is not required to, file a reply. The Court will then revisit the merits of Petitioner's claims.

## ORDER

**IT IS ORDERED:**

1. Respondent's Motion for Summary Dismissal (Dkt. 12) is DENIED without prejudice.

2. Petitioner shall have **42 days** in which to file a response of 20 pages or less to the Court's Order showing entitlement to relief. Respondent may file a reply within **14 days** after the response.

**MEMORANDUM DECISION AND ORDER - 36**

3.   Nothing further shall be filed in this case until the Court issues another order.

DATED:  September 29, 2020



_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge